# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2847-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JEREMIAH F. FORDE,

     Defendant-Appellant.

_____

Submitted February 6, 2024 – Decided September 9, 2024

Before Judges Gooden Brown and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment Nos. 19-02-0163, 20-01-0039, 20-11-0586, and 20-12-0674.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Samuel Carrigan, Assistant Deputy Public Defender, of counsel and on the briefs).

Robert J. Carroll, Morris County Prosecutor, attorney for respondent (Paula Jordao, Assistant Prosecutor, on the brief).

PER CURIAM

Following a jury trial, defendant Jeremiah Forde was convicted of several sex-related offenses, the most serious of which was first-degree aggravated sexual assault on a helpless or incapacitated person. The charges stemmed from defendant having sexual relations with a woman to whom he had provided illicit drugs in exchange for sex. Defendant filmed the encounters, some of which were played at trial. One of the encounters that was captured on video depicted defendant engaging in sexually explicit conduct with the woman who was later identified as K.M.[1] K.M. did not move or open her eyes for the duration of the video and later testified at trial that she never consented to defendant's actions as she was under the influence of heroin at the time. Defendant maintained that the sexual encounters were consensual.

After the trial, defendant entered negotiated guilty pleas to numerous unrelated charges and was sentenced to an aggregate term of twenty-eight years in prison, which included a nineteen-year sentence that was subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant was also sentenced to a special sentence of parole supervision for life, N.J.S.A. 2C:43-6.4, and requirements and restrictions under Megan's Law, N.J.S.A. 2C:7-1 to -23.

---

[1] We use initials to protect the victim's identity. R. 1:38-3(c)(12).

On appeal, defendant raises the following points for our consideration:

POINT I

THE LAY OPINION TESTIMONY FROM THE LEAD INVESTIGATOR EXPRESSING A BELIEF IN [DEFENDANT'S] GUILT WAS IMPERMISSIBLE AND RECURRENT, CAUSING UNFAIR PREJUDICE THAT THE TRIAL COURT WAS UNABLE TO CURE.

POINT II

THE [TWENTY-EIGHT]-YEAR AGGREGATE SENTENCE IS EXCESSIVE.

Based upon our review of the record and the applicable legal principles, we reject defendant's arguments and affirm.

I.

On January 15, 2020, defendant was charged in Morris County Indictment No. 20-01-0039[2] with first-degree aggravated sexual assault on a helpless or incapacitated person, N.J.S.A. 2C:14-2(a)(7) (count one); second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1) (count two); third-degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a) and 2C:14-2(a)(7) (count three); fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b) (count four); and three counts of third-degree invasion of privacy, N.J.S.A. 2C:14-9(b)(1) (counts five

---

[2] Indictment No. 20-01-0039 superseded Indictment No. 19-09-0762.

to seven).  The indictment also charged defendant with three other counts, but those counts were severed and later dismissed.  A six-day jury trial was conducted in July 2021, during which the State produced several witnesses, including the victim, K.M.  We glean these facts from the trial record.

Following a motor vehicle stop, defendant was arrested on December 28, 2018, by members of the Roxbury Police Department.  As a result of the arrest, an "L.G. Verizon cell phone and a Sony HDR-AS20 camera" were recovered from defendant's person.  The camera contained "[a]pproximately [fifty-one] videos."  Given the nature of the seizure, the Department contacted Detective Carolina Moreno, who was assigned to the Sex Crimes Unit at the Prosecutor's Office and became the lead investigator on the case.

On January 4, 2019, Moreno and several detectives executed a search warrant at defendant's apartment in Budd Lake.  The detectives seized a black tablet, a camera box for the previously seized Sony camera, and a cell phone box for the previously-seized Verizon cell phone.  During a forensic examination, eighty-two videos were found on the tablet.  One of the videos that is central to the issues raised on appeal was six minutes and twenty seconds long and was created at 5:40 a.m. on September 9, 2018.

At trial, Moreno testified that the September 9, 2018, video "appear[ed] to be taken in a hotel room or a motel room" and depicted a woman lying "on a floral comforter." According to Moreno, the woman had "[h]er eyes . . . closed" and appeared to be "limp" while she was "straddled by a male." Moreno testified that in the video,

> [the male] takes his penis out, he takes [the woman's] hands, both hands to masturbate his penis. He masturbates his own penis. He takes his penis and opens [the woman's] mouth with it and puts it in between her lips. The video . . . concludes with him ejaculating on [the woman's] face. The [woman] does[ not] move at all. To my recollection the only time her face even moves is when he like pats his penis on her face and she just kind of moves.

The video was admitted into evidence and played for the jury.

Moreno testified that after seeing the video, she attempted to identify the woman by taking "screen[shots] of her face" and submitting the pictures to the New Jersey State Police's Facial Recognition Unit. From their database, the woman was identified as K.M. On June 26, 2019, Moreno and other detectives went to K.M.'s home in Wharton to speak to her about the investigation. When Moreno showed K.M. the screenshots and "asked if she was the female in the [screenshots]," K.M. "immediately recognized herself" and "started crying." K.M. recognized her "rings and . . . bracelets" in the screenshots and was

5

"shock[ed]" and "devastated" when she saw the photos. K.M. had no "recollection or knowledge of th[e] video." She admitted that she "was on heroin at the time" but denied ever "agree[ing] to any of th[e] actions that took place in th[e] video."

In the course of the investigation, Moreno took screenshots of the clothing worn by the man in the September 9, 2018, video, including a "red shirt" with "distinctive . . . white lettering" and a "black jacket" with a "red zipper." Moreno also reviewed other videos found on the tablet seized from defendant, including four videos recorded on September 8, 2019, "between the hours of 6:37 p.m. and 9:16 p.m." at a business in Dover. In the September 8, 2019, videos, a man is depicted in the same distinctive clothing worn in the September 9, 2018, video and his face is visible. Additionally, the distinctive "red shirt with the white lettering" was found by detectives inside a bag in defendant's girlfriend's vehicle. Defendant lived with his girlfriend at the time.

Through her investigation, Moreno determined that the September 9, 2018, video with K.M. was taken at a hotel room at the Parsippany Inn in Morris Plains. Moreno took photos of the room and, during her testimony, matched details visible in the video with the room photos. In addition, Moreno reviewed the contents of the cell phone seized from defendant when he was arrested and

6

found eighteen text messages between defendant and K.M. on September 8, 2018, beginning at 7:53 p.m. and ending at 10:43 p.m. Among the text exchanges, defendant sent K.M. a text at 8:40 p.m., asking if K.M. was "coming out?" K.M. replied "yeah, I need a scoop." Defendant texted K.M. at 8:42 p.m., stating "I'll text you when I'm close to Wharton, like a half hour." At 10:43 p.m., defendant texted K.M., asking if she was "still home?"

Moreno also reviewed defendant's cell phone browsing web history and discovered that at 12:09 a.m. on September 9, 2018, defendant searched for "hotels in Morris Plains," visited booking.com, and searched Google for the Parsippany Inn. Finally, Moreno observed on defendant's phone a "photograph of [K.M.]" with a "comforter . . . over her" that looked like the comforter in the September 9, 2018, video.

Moreno met with K.M. again on November 7, 2019, after identifying three additional videos from defendant's tablet that Moreno believed depicted K.M. According to Moreno, all three videos depicted K.M. performing oral sex on defendant in a bathroom, which Moreno determined was located at the "Canal House in Wharton." The first video was filmed at approximately 5:00 a.m. on October 13, 2018. Earlier the same day, defendant and K.M. had texted each other, starting at 3:09 a.m., to arrange a meeting place. The second and third

7

videos were filmed on October 29, 2018, at 10:16 p.m. and 11:33 p.m., respectively. K.M. identified herself in all three videos and all three videos were admitted into evidence and played for the jury.

K.M. testified she was "not aware that th[ese] film[s] existed" and that she had "no discussions" and "no conversations" with defendant about him "videotaping th[e] act[s]." In fact, the first time she learned of the videos was through the investigation. K.M. admitted being addicted to drugs for several years and being arrested and placed on probation for drug possession related charges. She underwent substance abuse treatment but relapsed in August 2018, after her mother passed away unexpectedly. When she relapsed, K.M. was using heroin and sometimes cocaine every day, "many times" a day, for several months. K.M. testified that defendant was her drug dealer, and that she first met him after her mother died at the Canal House, a "rooming house" where people rented rooms, shared community bathrooms, and obtained drugs.

K.M. further testified that on September 8, 2018, her boyfriend, whom she had been dating seriously for a year, broke up with her through a text message. According to K.M., she "was devastated," and "went out to buy heroin" from defendant to cope. That evening, she texted defendant, "I need a scoop," meaning that she "needed to get picked up" so that she could get drugs at the

Canal House. Defendant picked her up at her house and gave her heroin, which she used "[r]ight away" in the car. K.M. had no memory of anything else that happened that evening.

K.M. acknowledged that because she "was desperate to get heroin," she had "made a deal" with defendant, whereby she agreed to "perform[] fellatio on him, [so] that he would provide [her] with heroin" without her paying for it. She further testified that she agreed to perform fellatio on defendant "at least three" times in the bathroom at the Canal House in exchange for heroin. However, K.M. testified she was not aware that defendant was recording her in the three sexual encounters at the Canal House.

On July 15, 2021, the jury found defendant guilty of counts one through five, and not guilty of counts six and seven of Indictment No. 20-01-0039. On August 25, 2021, the trial judge denied defendant's motion for a new trial. See R. 3:20-1; R. 3:20-2. On November 19, 2021, defendant negotiated a global resolution of four outstanding unrelated indictments and entered negotiated guilty pleas to two counts of third-degree promoting prostitution, N.J.S.A. 2C:34-1(b)(2), charged in Indictment Nos. 19-02-0163 and 20-11-0586, and one count of third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(7), charged in Indictment No. 20-12-0674. Indictment No. 20-02-0121 was dismissed in accordance with the plea

agreement. On February 18, 2022, the judge sentenced defendant on all four indictments and entered conforming judgments of conviction on March 16, 2022, from which this appeal follows.

## II.

In Point I, defendant argues that Moreno "gave inadmissible lay opinion testimony that went to the key questions meant to be resolved by an impartial jury." Defendant asserts that although the judge gave curative instructions to the jury on several occasions, the instructions "could not sufficiently remedy the harm caused" by Moreno's multiple lay opinions, which deprived defendant of "his right to a fair trial."

"[T]he decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." State v. Scott, 229 N.J. 469, 479 (2017) (alteration in original) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). "We defer to a trial court's evidentiary ruling absent an abuse of discretion," State v. Garcia, 245 N.J. 412, 430 (2021) (citing State v. Nantambu, 221 N.J. 390, 402 (2015)), and will "not substitute our own judgment for the trial court's unless its 'ruling "was so wide of the mark that a manifest denial of justice resulted,"'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). Still, not every mistaken evidentiary

ruling will "lead to a reversal of a conviction. Only those that have the clear capacity to cause an unjust result will do so." Garcia, 245 N.J. at 430.

When a trial judge determines that a curative instruction is needed to eliminate any prejudice resulting from the admission of improper testimony, the instruction "must be firm, clear, and accomplished without delay." State v. Vallejo, 198 N.J. 122, 134 (2009). Our Supreme Court "has consistently stressed the importance of immediacy and specificity when trial judges provide curative instructions to alleviate potential prejudice to a defendant from inadmissible evidence that has seeped into a trial." Id. at 135-36 (collecting cases).

In State v. Herbert, 457 N.J. Super. 490 (App. Div. 2019), we provided guidance to assess whether a curative or limiting jury instruction is adequate. "First, a court should consider the nature of the inadmissible evidence the jury heard, and its prejudicial effect." Id. at 505. "The adequacy of a curative instruction necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached." Ibid. (quoting State v. Winter, 96 N.J. 640, 647 (1984)). We further noted that "while a general charge may suffice to cure 'only slightly improper' remarks, 'a single curative instruction may not be sufficient to cure the prejudice resulting from cumulative

11

errors at trial.'" Ibid. (quoting Vallejo, 198 N.J. at 136). Additionally, "[e]vidence that bears directly on the ultimate issue before the jury may be less suitable to curative or limiting instructions than evidence that is indirect and that requires additional logical linkages." Ibid.

"Second, an instruction's timing and substance affect its likelihood of success." Ibid. "As for timing, . . . a swift and firm instruction is better than a delayed one," and "[a]s for substance, a specific and explanatory instruction is often more effective than a general, conclusory one." Id. at 505-06. An instruction can be more effective when the judge "'explains the reason for the underlying rule.'" Id. at 507 (quoting David A. Sklansky, Evidentiary Instructions and the Jury as Other, 65 Stan. L. Rev. 407, 452 (2013)). "Although trial judges may understandably try to avoid repeating and thereby reinforcing an offending remark, a court must describe it with enough specificity to enable the jury to follow the instruction." Ibid.

"Third, a court must ultimately consider its tolerance for the risk of imperfect compliance." Ibid. "Yet, even in criminal cases involving errors of constitutional dimension, 'not "any" possibility [of an unjust result] can be enough for a rerun of the trial.'" Ibid. (alteration in original) (quoting Winter, 96 N.J. at 647). "The possibility must be real, one sufficient to raise a reasonable

12

doubt as to whether the error led the jury to a result it otherwise might not have reached." Ibid. (quoting State v. Macon, 57 N.J. 325, 336 (1971)). On the other hand, "a non-constitutional error 'shall be disregarded by the appellate court "unless it is of a nature as to have been clearly capable of producing an unjust result."'" Id. at 507-08 (quoting Winter, 96 N.J. at 648).

> That said, we recognize that "[t]rials are not perfectly orchestrated productions." State v. Yough, 208 N.J. 385, 388 (2011). A curative instruction that is "firm, clear, and accomplished without delay" can be an appropriate remedy to a trial court's error in admitting proscribed evidence, [State v. Prall, 231 N.J. 567, 586 (2018)] (quoting [Vallejo, 198 N.J. at 134]), because the jury is presumed to follow the court's instructions, State v. Burns, 192 N.J. 312, 335 (2007).
>
> [State v. Gonzalez, 249 N.J. 612, 635 (2022) (first alteration in original).]

We now turn to the legal principles that govern lay opinion testimony and narration evidence by a witness who did not observe events depicted in surveillance videos in real time. Lay opinion testimony is admissible subject to two conditions set forth in N.J.R.E 701. First, the lay witness's opinion must be "rationally based on the witness' perception"; second, the opinion must "assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701. To satisfy the first condition, the "witness must have actual knowledge, acquired through his or her senses, of the matter to which he or she testifies."

13

State v. Sanchez, 247 N.J. 450, 466 (2021) (quoting State v. LaBrutto, 114 N.J. 187, 197 (1989)).  The second condition limits lay testimony only to that which will "assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue."  Id. at 469 (quoting State v. Singh, 245 N.J. 1, 15 (2021)); see also State v. Higgs, 253 N.J. 333, 363 (2023).  The second condition therefore precludes "lay opinion on a matter 'as to which the jury is as competent as [the witness] to form a conclusion.'"  Sanchez, 247 N.J. at 469-70 (alteration in original) (quoting State v. McLean, 205 N.J. 438, 459 (2011)).

Recently, our Supreme Court considered how our case law has applied N.J.R.E. 701 to law enforcement officers narrating video recordings or identifying the defendant as the individual depicted in a photograph or video relating to the offense charged:

> In State v. Lazo, we excluded the opinion testimony of a law enforcement officer unacquainted with a defendant who stated that he included a photo of the defendant in a photo array "[b]ecause of his similarities to the suspects that were described by the victim."  209 N.J. 9, 19 (2012) (alteration in original).  We held that "[n]either a police officer nor another witness may improperly bolster or vouch for an eyewitness' credibility and thus invade the jury's province."  Id. at 24.

A-2847-21

In State v. Singh, however, we affirmed the admission of an arresting officer's lay opinion that the sneakers worn by the suspect in surveillance video looked similar to sneakers worn by the defendant at the time of his arrest, given the officer's direct observation of the defendant's sneakers. 245 N.J. at 17-18. We held in Singh that the officer's reference to the suspect in the video as "the defendant" was improper in light of the dispute about the identity of the suspect, but that the reference was "fleeting" and did not amount to plain error. Ibid.

In Sanchez, we reversed the trial court's exclusion of the defendant's parole officer's identification of the defendant in a photograph taken from surveillance video, given the parole officer's many in-person meetings with the defendant and the capacity of her identification testimony to assist the jury. 247 N.J. at 469-75. There, the parole officer's identification derived from her personal perception, which enabled her to identify the defendant in the surveillance photograph "more accurately than a jury could." Id. at 474.

. . . .

In Higgs, we barred the lay opinion of a law enforcement officer who was not present at a shooting and testified that an object depicted in a surveillance video appeared to be a firearm. 253 N.J. at 365-67. Applying N.J.R.E. 701's "perception" prong, we noted that the detective "had no prior interaction or familiarity with either defendant or the firearm in question" and that "[h]is testimony was based entirely on his lay opinion from watching the video." Id. at 365. We reasoned that "[t]he video was in evidence and the jury should have been permitted to view it slowly, frame by frame, to determine for themselves what they

15

saw on screen, without the influence of opinion testimony by an officer who was not there at the time." Id. at 367. We held that the officer's testimony had invaded the jury's province. Id. at 366-67. We did not, however, "rule out the possibility of allowing a law enforcement officer to testify about a sequence in a video that is complex or particularly difficult to perceive." Id. at 367.

In State v. Watson, . . . we addressed the admissibility of a police officer's narration of a video of a bank robbery at which the officer was not present, and held that the narration exceeded the bounds of proper lay opinion testimony under N.J.R.E. 701 and N.J.R.E. 602 when the officer provided commentary about the suspect's actions during the robbery. [Watson, 254 N.J. 558, 606-08 (2023)]. We disapproved of portions of the officer's narration testimony that reflected his subjective belief of what occurred in the surveillance video, including observations about alleged efforts by the suspect not to touch surfaces during the robbery and a comment that "the suspect was very careful in . . . not attempting to leave any type of evidence behind." Id. at 608.

[State v. Allen, 254 N.J. 530, 544-46 (2023) (all but last alteration in original) (last omission in original).]

After reviewing other jurisdictions' handling of the subject, in Watson, the

Court held that "Rules 701, 602, and 403 provide a framework for the admission

of narration evidence" by "a witness who did not observe events in real time."

Watson, 254 N.J. at 600, 602. The Court stated:

[W]hether narration evidence is helpful turns on the facts of each case. Rule 701's helpfulness prong can be

16

satisfied when an investigator draws attention to key details that might be missed, or helps jurors follow potentially confusing, complex, or unclear videos that may otherwise be difficult to grasp. Counsel may offer other reasons to allow limited narration testimony, which courts should evaluate with care.

Narration testimony must also comply with N.J.R.E. 403. The rule guards against the risk of "[u]ndue prejudice, confusion of issues, . . . misleading the jury, . . . [and] needless presentation of cumulative evidence." Placing appropriate limits on narration testimony can help avoid those problems.

[Id. at 602 (alterations and omissions in original).]

The Court added that such testimony "must accord with specific limits." Ibid. First, "continuous commentary during a video by an investigator whose knowledge is based only on viewing the recording" must be avoided. Id. at 603. Second, an investigator may "describe what appears on a recording but may not offer opinions about the content. In other words, they can present objective, factual comments, but not subjective interpretations." Ibid. "Third, investigators may not offer their views on factual issues that are reasonably disputed," as "[t]hose issues are for the jury to decide." Ibid. Finally, while "lay witnesses generally may offer opinion testimony under Rule 701 based on inferences, investigators should not comment on what is depicted in a video based on inferences or deductions, including any drawn from other evidence.

17

That type of comment is appropriate only for closing argument." Id. at 604. The Court explained that, "[c]onsistent with those principles, an investigator who carefully reviewed a video in advance could draw attention to a distinctive shirt or a particular style of car that appear in different frames, which a jury might otherwise overlook," if those issues are not in dispute. Ibid.

Applying these principles, we discern no abuse of discretion in the judge's rulings and no basis to intervene. Defendant challenges various instances of Moreno's purportedly incurable lay opinion testimony that he believes created unfair prejudice warranting reversal of his convictions. Specifically, defendant points to Moreno's description of K.M. as "asleep" or "unconscious" in the September 9, 2018, video; Moreno labelling the September 9, 2018, video as "the aggravated sexual assault video;" Moreno repeatedly identifying defendant "as the person depicted in pictures and videos, even where his face was not visible;" and Moreno referring to K.M. as "the victim."

When describing the September 9, 2018, video, Moreno testified that the woman in the video was "unconscious." Upon defense counsel's immediate objection, the judge told Moreno that this was a "medical conclusion[]" and directed Moreno to "describe what [she] saw, but not whether the person [was] unconscious." Moreno then testified that the woman's "eyes were closed, [and]

A-2847-21

she was[ not] moving." Moreno said "I do[ not] want to say sleeping, because it seemed to be more than sleeping."

Moreno added, "to me . . . [the woman] was not awake in the video" because she "does[ not] move at all." Defense counsel objected, and the judge sustained the objection, instructing the jury, "Members of the Jury, you will determine what the state of the person on the video is, and disregard Detective Moreno's testimony that she was unconscious or asleep. You will make that determination." Additionally, during the final charge, the judge reiterated:

> [A]s I have previously instructed you, you shall disregard . . . certain testimony of Detective Carolina Moreno during her direct testimony as impermissible lay opinion.
>
> Those impermissible lay opinions were that the female in the [September 9, 2018,] video admitted into evidence . . . was unconscious or asleep . . . .
>
> Such determinations are the province of the jury as judges of the facts after consideration of all of the evidence. . . . Detective Moreno is . . . no better situated than you, the jury, to make such determinations.
>
> You are instructed to disregard those impermissible lay opinions. You, the jury, will determine from all of the evidence the condition of the female in [the September 9, 2018, video].

We are satisfied that the judge's swift, specific, and effective curative instructions properly directed the jury to disregard the testimony and ameliorated any harm from Moreno's objectionable testimony. We therefore reject defendant's claims of unremedied "unfair prejudice."

Regarding defendant's challenge to Moreno repeatedly identifying defendant as the person depicted in the videos and screenshots of the videos, the State counters that defendant conceded in his opening statement that he was in the videos because his defense was that "the encounters and recordings between defendant and K.M. were consensual." Indeed, in defense counsel's opening statement, he argued that "K.M. consented to each and every video that was taken in exchange for heroin from [defendant]." Defense counsel suggested that "[o]ut of . . . embarrassment," K.M. may now testify that she did not consent to the videos, but maintained that "[K.M.] did consent to all of the" videos that are the subject of the charges.

Further, during Moreno's testimony, defense counsel did not object to Moreno identifying defendant. When Moreno was describing the September 9, 2018, video, she stated that "defendant [was] taking the victim's hand and plac[ing] it on his penis." When Moreno was describing a screenshot from that video, she stated that she could "see . . . defendant's shadow next to" a refrigerator in the

hotel room. Additionally, Moreno testified that she took screenshots "of the [red] shirt . . . defendant was wearing" in the video. Further, Moreno testified that in several of the screenshots, "defendant's face" was visible, and he was seen wearing "the red shirt [with] the white lettering." At no point did defense counsel object to the testimony or the identification.

In fact, during Moreno's testimony, it was the judge who raised the issue of whether he "should give a curative instruction as to Detective Moreno's testimony that that was defendant's face." Referring to his opening statement, defense counsel replied that an instruction was not needed. The judge acknowledged defense counsel's opening statement, noted that the issue was "not contested," and confirmed with defense counsel that he was waiving any objection. Nonetheless, when the jury returned from recess, the judge still gave the following curative instruction:

> Before we resume that testimony though, I do want to give you a curative instruction. Detective Moreno, on at least two occasions, there may have been another one, . . . testified that . . . it was defendant's face . . . on some of the [screenshots]. . . . You are to disregard that. That is what is known as a lay opinion. That is your province as jurors to determine whether that is defendant's face or not in the[screenshots], all right? So you are to disregard her testimony to that effect. . . . [T]hat is something that you can consider as to whether or not that is, in fact, defendant's face.

When Moreno's direct examination resumed, she testified that in the October videos, K.M. was "performing oral sex or fellatio on . . . defendant." When defense counsel objected, the judge overruled the objection in the following colloquy at sidebar:

> [DEFENSE COUNSEL]: . . . [Moreno] said [K.M. is] performing fellatio on . . . defendant. Th[ere] was a prior curative instruction . . . . So . . . [Moreno] is . . . presenting . . . that [K.M. is] performing fellatio in the video, but does[ not] have to say it[ is] upon . . . defendant. The jury is going to have [to] make that determination.
>
> . . . .
>
> THE COURT: Is that a contested point?
>
> [DEFENSE COUNSEL]: I[ am] just trying to be consistent, Judge. The curative instruction where she referred to him as . . . defendant—
>
> . . . .
>
> [PROSECUTOR]: In the opening you said she consented to all these acts.
>
> . . . .
>
> THE COURT: That[ is] why I did[ not] think you were contesting it, so that[ is] true. So what do you want me to do?
>
> [DEFENSE COUNSEL]: Well, if you can just [give] an instruction, that[ it is] up to the jury's determination.

A-2847-21

Just to be consistent with the prior curative instruction given on the photographs.

. . . .

THE COURT:  . . . . I[ am] going to overrule that objection given the opening.  I mean, has your position changed since the opening?

[DEFENSE COUNSEL]: No.

THE COURT: Okay.  Then I[ will] overrule.

Despite overruling the objection, the following day, before Moreno continued her testimony, the judge instructed the jury to "disregard" Moreno's testimony that "defendant [is] . . . in . . . the videos . . . and . . . certain of the still photographs." The judge continued,

> You, the jury, will determine from all of the evidence whether or not it is defendant . . . in the videos . . . and the still photographs from those videos.  Detective Moreno is in no better position than you, the jury, to identify the person who is in the videos and photographs.  I instruct you to disregard her testimony that the person was . . . defendant . . . as it is impermissible . . . lay witness opinion testimony . . . I instruct you to evaluate for yourselves all of the evidence . . . concerning the videos and the photographs.

"'Generally, if no objection was made to the improper remarks,' they 'will not be deemed prejudicial.'" State v. Kane, 449 N.J. Super. 119, 141 (App. Div. 2017) (quoting State v. Frost, 158 N.J. 76, 83 (1999)).  "The failure to object suggests that

23

defense counsel did not believe the remarks were prejudicial at the time they were made" and "deprives the court of an opportunity to take curative action." Frost, 158 N.J. at 84. Under Rule 2:10-2, "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result."

Because defense counsel did not object to most of Moreno's references to "defendant" in the videos and photos, we disregard the references because "they were not so prejudicial as to meet the plain error standard." Singh, 245 N.J. at 18. Because defendant conceded during trial that he was in the videos, he cannot now argue that Moreno's references to him created undue prejudice. As to defense counsel's single objection, the judge ultimately provided prompt, clear, forceful, and effective curative instructions, both throughout the trial and before deliberations. We are satisfied that the judge's instructions eliminated any prejudice resulting from the admission of Moreno's testimony, and that the jury followed the instructions. See Gonzalez, 249 N.J. at 635.

Next, defendant argues that "Moreno gave further inadmissible and prejudicial testimony by continuing to refer to [K.M.] as 'the victim.'" Defendant contends that "[d]espite defense counsel's objection on the second day of trial," the judge "did not issue a curative instruction . . . until the third day."

24

On the second day of trial, during her direct examination, Moreno referred to K.M. as "the victim" on several occasions, including twice when Moreno was describing the September 9, 2018, video, and two more times when describing screenshots of the video. After the four references, in a sidebar, defense counsel raised his concerns for the first time. The following day, the judge reviewed his proposed curative instruction with counsel. Upon their agreement, the judge instructed the jury as follows:

> Detective Moreno in her direct testimony referred to [K.M.] as "the victim". I instruct you . . . to disregard that testimony. [K.M.] is the alleged victim. [Defendant] is presumed innocent . . . , and you, the jury, as judges of the facts will determine whether or not the State meets its burden of proving each and every element . . . of each charge beyond a reasonable doubt. And . . . that will be done after all of the evidence is before you. Again, [K.M.] is the alleged victim . . . and [defendant] is presumed innocent.

In the final jury charge, the judge reiterated that "Moreno[,] in her direct testimony, referred to . . . [K.M.] as 'the victim.' . . . I instruct you to disregard that testimony." The judge continued,

> defendant is presumed innocent and you, the jury, will determine . . . after consideration of all the evidence . . . whether or not the State has met its burden of proving each and every element . . . of each charge beyond a reasonable doubt. Again, the State alleges that [K.M.] is the victim and . . . defendant is presumed innocent.

25

Despite the slight delay, see Prall, 231 N.J. at 587 (holding curative instruction given "twelve days after the improper testimony" was insufficient), the substance of the instructions clearly explained that the jury was to disregard the reference to K.M. as a victim and we presume the jury followed the judge's instructions, see Gonzalez, 249 N.J. at 635. As such, we are satisfied Moreno's references to K.M. as "the victim" did not cause defendant undue prejudice and did not "'lead to a verdict that could not otherwise be justly reached,'" Herbert, 457 N.J. Super. at 505 (quoting Winter, 96 N.J. at 647).

Defendant also argues that "the most serious prejudicial testimony" was presented when Moreno twice described the September 9, 2018, video as an "aggravated sexual assault video." Defendant argues that because Moreno labelled the video before it was "first screened for the jurors," "the jurors had no chance to watch the video without a preconceived notion of what it would portray." Further, although the judge gave a curative instruction when defendant objected, defendant asserts that in the final jury charge, the judge did not reiterate the instruction. Nonetheless, according to defendant, "no curative instruction could possibly be sufficient."

After Moreno improperly characterized the September 9, 2018, video and defense counsel objected, the judge sustained the objection and promptly issued the following curative instruction:

> Ladies and gentlemen, I[ am] sustaining the objection. Detective Moreno has now twice referred to . . . the video[] as the aggravated sexual assault video. Disregard that. The question whether. . . [it is] . . . aggravated sexual assault is the province of the jury.

We are satisfied that Moreno's description of the video, while objectionable, was not so prejudicial that the judge's instruction could not cure its prejudicial impact. Indeed, the "judge immediately instructed the jury in the strongest terms to disregard the offending remark. Moreover, the evidence of defendant's guilt was so strong . . . that in the overall picture the error in question must be regarded as inconsequential . . . ." Winter, 96 N.J. at 648 (omissions in original) (quoting State v. La Porte, 62 N.J. 312, 318 (1973)).

## III.

Finally, in Point II, defendant challenges his sentence as "excessive" on the grounds that (1) "it is not based on a proper fairness assessment considering the diminishing deterrence effects of a lengthier sentence;" and (2) the judge failed to "give greater consideration" to defendant's age, "especially as it pertains to . . . deterrence." Defendant also contends that "the invasion of

privacy conviction should have merged into the sexual assault conviction because both offenses occurred at the exact same time and place, and both convictions were part of a single criminal episode."

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)).  Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

In State v. Yarbough, 100 N.J. 627, 643-44 (1985), our Supreme Court set forth guidelines for evaluating the threshold question of whether to impose concurrent or consecutive sentences for multiple offenses pursuant to N.J.S.A. 2C:44-5(a).  The Yarbough Court enumerated five specific facts sentencing courts should consider, including whether or not:

> (a) the crimes and their objectives were predominantly independent of each other;

(b) the crimes involved separate acts of violence or threats of violence;

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous.

[Yarbough, 100 N.J. at 644.]

"The Yarbough factors serve much the same purpose that aggravating and mitigating factors do in guiding the court toward a sentence within the statutory range," State v. Abdullah, 184 N.J. 497, 514 (2005), and "should be applied qualitatively, not quantitatively," Carey, 168 N.J. at 427; see also State v. Molina, 168 N.J. 436, 442 (2001) (affirming consecutive sentences although "the only factor that support[ed] consecutive sentences [was] the presence of multiple victims").

In Abdullah, the Court reminded trial judges "that when imposing either consecutive or concurrent sentences, '[t]he focus should be on the fairness of the overall sentence,' and that they should articulate the reasons for their decisions with specific reference to the Yarbough factors." 184 N.J. at 515 (alteration in original) (quoting State v. Miller, 108 N.J. 112, 122 (1987)). In State v. Torres,

246 N.J. 246 (2021), the Court directed that when imposing lengthy consecutive sentences, "an explanation for the overall fairness of a sentence by the sentencing court is required" in order to curtail and, if necessary, correct "'arbitrary or irrational sentencing.'" Id. at 272 (quoting State v. Pierce, 188 N.J. 155, 166-67 (2006)). Thus, consideration of the fairness of the overall sentence is "a necessary feature in any Yarbough analysis." Cuff, 239 N.J. at 352.

Our Supreme Court has explained that "[a] defendant's age is doubtlessly among the information that courts should consider when calibrating a fair sentence. Assessing the overall fairness of a sentence requires a real-time assessment of the consequences of the aggregate sentences imposed, which perforce includes taking into account the age of the person being sentenced." Torres, 246 N.J. at 273. However, "age alone cannot drive the outcome. An older defendant who commits a serious crime, for example, cannot rely on age to avoid an otherwise appropriate sentence." Ibid.

Here, on Indictment No. 20-01-0039, the judge sentenced defendant to nineteen years in prison, subject to NERA, on the aggravated sexual assault charge (count one), and a concurrent four-year term on the invasion of privacy charge (count five). The remaining charges were merged into count one. On the three unrelated indictments, the judge imposed a three-year term, with a nine-month

30

A-2847-21

period of parole ineligibility, on each, to run consecutive to each other and to the nineteen-year sentence, for an aggregate sentence of twenty-eight years.

Based on the high risk of re-offense, the extent of defendant's prior criminal record, and the need for deterrence, the judge found aggravating factors three, six, and nine. See N.J.S.A. 2C:44-1(a)(3), (6), (9). Acknowledging defendant's "adjudications of delinquency" and "three prior indictable offense convictions," as well as an absence of remorse or empathy for his victims, the judge "ha[d] no doubt" that defendant would re-offend if given the opportunity. According to the judge, "given the grave risk of re[-]offense," there was an "overwhelming need" to deter defendant specifically, as well as the general need to deter others from violating the law. The judge found no mitigating factors and concluded that the aggravating factors outweighed "the nonexistent mitigating factors."

The judge also analyzed and weighed the Yarbough factors, and considered the overall fairness of the consecutive sentences under Torres, concluding that the aggregate sentence was appropriate "in totality." Despite defendant's age,[3] the judge highlighted that defendant's "criminal sexual behavior is characteristic of an individual with antisocial personality traits who

---

[3] Defendant was born in 1981.

does not respect laws and does not hesitate to use violence to achieve his goals." The judge continued that defendant "views some people . . . [including] . . . the victims . . . in these cases," "as chattel, as property, . . . [and] as vehicles for his own sexual gratification and financial benefit."

Contrary to defendant's contentions, we are satisfied the judge meticulously adhered to the sentencing principles in identifying and applying the aggravating factors, and complied with the dictates of Yarbough and Torres in imposing the overall sentence. Because the judge's explanation was clear, detailed, and supported by competent, credible evidence in the record, there is no basis to disturb the judge's findings.

Equally unavailing is defendant's contention that the judge erred when he "did not merge the invasion of privacy conviction" with the aggravated sexual assault conviction. "In State v. Bowens, the Court, relying on N.J.S.A. 2C:1-8, held that merger is not required when each offense 'may be established by proof of a different fact which the other does not require.'" State v. Herrera, 469 N.J. Super. 559, 566 (App. Div. 2022) (quoting State v. Bowens, 108 N.J. 622, 639 (1987)). "However, that standard 'has been characterized as "mechanical."'" Ibid. (quoting State v. Tate, 216 N.J. 300, 307 (2013)).

Most recently in State v. [Michael] Miller, the
Court reaffirmed that we are to use the more flexible

approach to merger issues, stressing that convictions for "offenses that merely offer an alternative basis for punishing the same criminal conduct will merge." 237 N.J. 15, 33 (2019) (quoting [State v. Brown, 138 N.J. 481, 561 (1994))]. With respect to the fact-sensitive portion of the multi-part merger test, the Court explained that the flexible standard entails,

> [the] analysis of the evidence in terms of, among other things, the time and place of each purported violation; whether the proof submitted as to one count of the indictment would be a necessary ingredient to a conviction under another count; whether one act was an integral part of a larger scheme or episode; the intent of the accused; and the consequences of the criminal standards transgressed.

[Herrera, 469 N.J. Super. at 567 (all but second alteration in original) (quoting State v. Davis, 68 N.J. 69, 81 (1975)).]

Under N.J.S.A. 2C:14-9(b)(1), invasion of privacy is defined as follows:

> An actor commits a crime of the third degree if, knowing that he [or she] is not licensed or privileged to do so, he [or she] photographs, films, videotapes, records, or otherwise reproduces in any manner, the image of another person whose intimate parts are exposed or who is engaged in an act of sexual penetration or sexual contact, without that person's consent and under circumstances in which a reasonable person would not expect to be observed.

Under N.J.S.A. 2C:14-2(a)(7), aggravated sexual assault on a helpless or incapacitated person is defined as follows:

33

a. An actor is guilty of aggravated sexual assault if the actor commits an act of sexual penetration with another person under any one of the following circumstances:

. . . .

(7) The victim, at the time of sexual penetration, is one whom the actor knew or should have known was:

(a) physically helpless or incapacitated . . . .

Here, the judge explained that the invasion of privacy conviction did not merge with the aggravated sexual assault conviction because of the "additional element" of "recording involved." The judge further expounded:

[T]he jury did find [defendant] guilty of that invasion of privacy [charge] which was recording the sexual act without the victim's consent. That[ is] a third degree crime . . . [in] violation of [N.J.S.A.] 2C:14-9(b)(1). That does not merge so a separate sentence will be required on that. And that is because of the recording element that[ is] not involved in any of the counts one through four.

Both parties agreed with the judge's merger ruling as do we. The crime of invasion of privacy clearly and distinctly requires a recording element that is not present in aggravated sexual assault.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

34